Rodney LOOMIS, d/b/a Loomco International and Loomco Auctioneers, Inc., Plaintiffs,

v.

TULIP, INC., Polymerics, Inc., Duncan Enterprises, Inc., Creative People, Inc., Barry D. Hochberg, and Mark S. Greenfield, Defendants,

and

Fleet Bank, N.A., Trustee Defendant.

No. C.A. 97–10334–JLT.

United States District Court, D. Massachusetts.

Jan. 27, 1998.

Kevin F. Moloney, Barron & Stadfeld, Boston, MA, Louis S. Ederer, Cowan, Liebowitz & Latman, New York, NY, for Rodney Loomis, Loomco Auctioneers, Inc.

Stephanie M. Williams, Mark D. Cahill, Kurt Wm. Hemr, David A. Attisani, Choate, Hall & Stewart, Boston, MA, for Duncan Enterprises.

Paul S. Hughes, Newton, MA, for Creative People, Inc., Barry D. Hochberg.

Mark D. Cahill, David A. Attisani, Choate, Hall & Stewart, Boston, MA, for Mark S. Greenfield.

## MEMORANDUM

TAURO, Chief Judge.

This matter arises from the botched negotiation of a storage facility lease between the plaintiffs, Rodney Loomis, Loomco International, and Loomco Auctioneers (collectively, "Loomco"), and Berkeley Investments ("Berkeley"), a nonparty to the supervening action. In Count Ten of the Amended Verified Complaint, Loomis asserts a claim of tortious interference with contractual relations against Defendant Mark S. Greenfield in connection with the lease.[1] Greenfield is an attorney who has represented Defendant Duncan, Inc. ("Duncan") at all times relevant to this case. Presently before the court is Defendant Greenfield's motion to dismiss.

## I.

### GOVERNING LEGAL PRINCIPLES

#### A. Dismissal Standard

A motion to dismiss, pursuant to Federal Rule of Civil Procedure 12(b)(6), must be granted if the court determines, after viewing the well-pleaded facts in the light most favorable to the plaintiffs, that they can prove no set of facts that would entitle them to relief. *Lessler v. Little*, 857 F.2d 866, 867 (1st Cir.1988), *cert. denied*, 489 U.S. 1016, 109 S.Ct. 1130, 103 L.Ed.2d 192 (1989). Under Massachusetts law, Loomco would be required to establish the following in order to avoid dismissal of its claim against Greenfield for tortious interference with prospective contractual relations: (1) a contractual or business relationship between Loomco and Berkeley contemplating economic benefit; (2) Greenfield's knowledge of that business relationship; (3) Greenfield's inten-

---

1. In particular, Loomco claims that, on February 19, 1997, Greenfield spoke with representatives of Berkeley and asked that Berkeley refrain from entering into a lease with Loomco for one day while Defendant Duncan decided whether it would holdover its existing lease.

tional interference with that relationship for an improper purpose or by improper means; and (4) damages. *Swanset Development Corp. v. Taunton,* 423 Mass. 390, 397, 668 N.E.2d 333, 338 (1996). Moreover, even if Loomco demonstrates each of these elements, it will prevail only if Greenfield's offending action is "an unprivileged interference." *Laurendeau v. Kewaunee Scientific Equipment,* 17 Mass.App.Ct. 113, 122, 456 N.E.2d 767, 773 (Mass.App.Ct.1983)

### B. *The Massachusetts Litigation Privilege*

#### 1. *The Parties' Positions*

Although Greenfield denies all of Loomco's allegations against him, he states that, even if Loomco's claims are true, their action against him for tortious interference with prospective contractual relations is barred by the Massachusetts litigation privilege. More particularly, Greenfield asserts that Loomco's claim derives solely from certain negotiations indisputably undertaken by him on behalf of his client, Defendant Duncan, and his alleged misstatements before this court.[2] Anchoring Greenfield's analysis is the assertion that, because he represented Defendant Duncan's interests in the supervening litigation during any discussions he may have had with Berkeley, his statements are pertinent to the litigation and are, therefore, protected by the Massachusetts' litigation privilege.

Loomco, for its part, argues that, in order to be covered by the privilege, Greenfield's alleged tortious acts must have been directed toward a participant in the litigation, not an unconnected third party. Plaintiff further argues that Berkeley is just such an unrelated party and, as a result, even if Greenfield's

alleged tortious acts were pertinent to the supervening litigation, Berkeley's nonparty status renders such acts unprivileged.

#### 2. *The Scope of the Privilege*

■ Under Massachusetts law, an attorney's communications are absolutely privileged "[w]here such statements are made by an attorney engaged in his function as an attorney whether in the institution or conduct of litigation or in conferences and other communications preliminary to litigation." *Sriberg v. Raymond,* 370 Mass. 105, 109, 345 N.E.2d 882, 884 (1976). In construing this tenet, the First Circuit, with then Judge Breyer writing, concluded that, although a statement must be " 'pertinent to the proceedings' to come within the privilege, ... this requirement is to be broadly construed."[3] *Blanchette v. Cataldo,* 734 F.2d 869 (1st Cir.1984)(quoting *Sullivan v. Birmingham,* 11 Mass.App.Ct. 359, 416 N.E.2d 528, 531 (Mass.App.Ct.1981)).

The Supreme Judicial Court set forth the justification for such broad construction of the privilege in *Sriberg,* explaining,

> The public policy of permitting attorneys complete freedom of expression and candor in communication in their efforts to secure justice for their clients commends itself to us. The basic elements of such a policy were recognized early in this Commonwealth by Chief Justice Shaw in the following terms: "[I]t is, on the whole, for the public interest, and best calculated to subserve the purposes of justice, to allow counsel full freedom of speech, in conducting the causes, and advocating and sustaining the rights, of their constituents; and this freedom of discussion ought not to be

---

**2.** In his unauthorized reply to Loomco' opposition to his motion to dismiss, Greenfield contends that Loomco bases its claims of intentional interference with prospective contractual relations on statements made by Greenfield to this court during a February 20, 1997 hearing. Although such statements would, obviously, fall within the privilege, a close reading of Loomco' Amended Verified Complaint demonstrates that Loomco makes no such claim. Specifically, Loomco's only basis for complaint is its averment that,

> "[o]n the morning of February 20, 1997, prior to the status conference, Berkeley informed Loomco that it had spoken to Greenfield on

February 19, 1997, and that Greenfield had asked Berkeley to hold off entering into any lease agreement with Loomco for a period of at least one day...."

Amended Verified Complaint, ¶ 141.

**3.** Accordingly, it is not Greenfield's motive or his purported malice in initiating the complained-of communication that is at issue. *See United States v. Rockland Trust Company,* 860 F.Supp. 895, 903 (D.Mass.1994)(noting that the fact "that the statement may have been made maliciously or in bad faith ... would not cause [the attorney's] immunity to be withdrawn"). Only the pertinence of that communication matters.

impaired by numerous and refined distinctions."

*Sriberg,* 370 Mass. at 108–09, 345 N.E.2d at 884 (quoting *Hoar v. Wood,* 3 Metc. 193, 197–98, 44 Mass. 193 (1841)). Although the privilege and this underlying policy are most often asserted against complaints of libel or slander, *see, e.g., Sriberg v. Raymond,* 370 Mass. 105, 345 N.E.2d 882, it remains well-established that the privilege applies, "not only in defamation cases, but as a general bar to civil liability based on [an] attorneys's statements." *Blanchette,* 734 F.2d at 877; *see also Rockland Trust,* 860 F.Supp. at 903. Moreover, as the *Blanchette* court observed, "[t]he Massachusetts district court has ... recognized the [specific] applicability of the privilege to suits for interference with advantageous relations." *Blanchette,* 734 F.2d at 877.

## II.

### *ANALYSIS*

With these considerations in mind, the court must determine the following: (1) whether there exists, as Loomco asserts, a bar to application of the privilege in all cases where the offending communication is made to a nonparty, thereby requiring abrogation of Greenfield's privilege based on Berkeley's nonparty status; (2) if no such bar exists, whether the offending communication was pertinent to the corresponding litigation and, therefore, deserving of the privilege; and (3) if the offending communication was pertinent, whether the privilege was lost by unwarranted publication of the communication to unrelated third parties.

### A. *The Effect of the Communicatee's Nonparty Status*

█ The fact that Berkeley is not a party to the litigation does not necessarily render all communications made to it unprivileged. Rather, the relevant inquiry of whether the communication is pertinent to the supervening litigation governs. In *Leavitt v. Bickerton,* 855 F.Supp. 455 (D.Mass.1994), for example, the allegedly offending communication transpired between an agent of the defense attorney and certain nonparty employers of the plaintiff. Despite the communicatee employers' nonparty status, the court focused its inquiry on whether the communication was pertinent to the litigation.[4] In fact, the court explicitly rejected the contention that the "privilege ... should be narrowly drawn because the parties contacted were ... not parties involved in the suit."

█ This court, therefore, deems Loomco's contention that Berkeley's nonparty status acts as an absolute bar to application of the privilege erroneous.

### B. *The Pertinence of Defendant Greenfield's Communication*

In determining whether the Greenfield/Berkeley communication was pertinent to the litigation between Loomco and the named defendants, both *Leavitt* and *Blanchette* provide guidance. In particular, the *Leavitt* court elucidated the pertinence standard by referencing and applying the Restatement (Second) of Torts, Section 586, as directed by the Supreme Judicial Court in *Sriberg,* 370 Mass. at 108, 345 N.E.2d 882. Comment c to Section 586 states that, to be pertinent, "defamatory matter [must have] some reference to the subject matter of the proposed or pending litigations, although it need not be strictly relevant to any issue involved in it."[5] Moreover, as the *Leavitt* court further noted, " 'the words "pertinent to the proceedings" are not to be construed narrowly, nor according to evidentiary rules

---

4. Similarly, the First Circuit, in *Blanchette,* questioned whether the contested communication, initiated by Penn Central Railroad's attorney, was pertinent to settlement negotiations between the Santa Fe Railroad and a freight claims agent despite Penn Central's nonparty status. It is, therefore, apparent that nonparty status does not act as a bar to application of the litigation privilege where either the communicatee or the communicator is the nonparty to the relevant litigation. Given the posture of this case, however, the court will focus on the communicatee inquiry undertaken in *Leavitt.*

5. Although *Leavitt* and the Restatement excerpts cited therein address defamation specifically, the contours of the privilege, as refined under both, apply equally to the cause of action asserted in this case. *See Blanchette,* 734 F.2d at 877 (holding that the attorney privilege set forth in the Restatement applies to claims of intentional interference with contractual relations).

as to admissibility.'" *Id.* At 457 (quoting *Sullivan,* 11 Mass.App.Ct. at 362, 416 N.E.2d 528).

In *Leavitt,* the plaintiff brought a malpractice action, alleging that the defendant doctor had caused brain damage to her son. The statements at issue, made to the plaintiff's former employers, focused on the plaintiff's use of alcohol during her pregnancy and implied that her son's brain damage had resulted from Fetal Alcohol Syndrome rather than malpractice. Given that the statements made by the defense attorney's agent to the former employers thereby informed a theory of alternative causation, the court determined that they were pertinent to the litigation and, therefore, protected by the privilege.

The *Blanchette* court employed a similarly broad definition of pertinence in a case involving alleged tortious interference with contractual relations. There, the court ruled that the communication between Penn Central's attorney and the Santa Fe was pertinent to the settlement discussions between the freight claims agent and the Santa Fe because those discussions involved shipments carried over both Santa Fe and Penn Central lines. *Blanchette,* 734 F.2d at 877. Significantly, railroads that shared the task of transporting a shipment also shared the liability for damages. *Id.* Given this background, then Judge Breyer wrote, "We do not see how Cataldo [the freight claims agent] could deny that Penn Central had a legal interest in some of his 'global settlement claims' against the Santa Fe." *Id.* at 877–78. By effectively focusing his analysis on nonparty Penn Central's interest in the Santa Fe settlement discussions, and concluding that the communication was pertinent to those discussions, Judge Breyer gave form to his instruction regarding broad construal of the pertinence standard.

Like the communications in *Leavitt* and *Blanchette,* the statements at issue here are pertinent to the litigation. Specifically, the parties' respective abilities to obtain a leasehold from Berkeley appears to have determined which of them maintained control of the inventory and equipment at issue in the supervening litigation. Because Duncan retained its leasehold through February 20, 1997, it was able to exercise control over those goods.

In turn, Loomco's inability to lease Berkeley's facility directly impacted its claims for liability and damages in the supervening litigation. In fact, had it been able to lease the facility, its claim of total conversion would have been extinguished. In addition, its motion practice during this litigation may have differed had the communication not occurred and had it obtained such a lease. Certainly, for example, it would not have renewed its motion for a temporary restraining order.

And so, not only was the offending communication pertinent to the litigation, but Berkeley's lease negotiations with Loomco and Greenfield, as well as the parties' respective legal interests therein, are inextricably tied to the supervening litigation.

Finally, unlike the third party communicatee in *Leavitt* and like the third party communicator in *Blanchette,* Berkeley possessed at least a limited legal interest in the outcome of the litigation at the time of the purported communication. In particular, allowance of the then-pending temporary restraining order would have affected Berkeley's rights as a lessor.[6] Furthermore, other rulings in the litigation may have affected, among other things, the nature or duration of the leasehold, the identity of the leaseholder, and the timing and location of the auction—all of which could have directly and disparately impacted Berkeley.[7] Berkeley's interested assertion effectively bolsters

---

6. The motion for a temporary restraining order, included in both the Verified and Amended Verified Complaints, requests that the court preliminarily and permanently enjoin Defendants Polymerics, Duncan, Creative, Tulips and Hochberg from "removing or disposing of any of the goods that Loomco purchased which remain at the [Berkeley facility], or permitting others to perform such acts." Amended Verified Complaint,

¶¶ 50.b., 56.b., 65.b., 74.b., 85.b., 94.b., 103.b., 111.b., 121.b., 131.b., and 152.b.

7. Notably, though the Duncan Lease required delivery to Berkeley of the demised portion of the facility "broom clean" on February 28, 1997, rulings by this court might, at the time of the communication, have impacted Duncan's ability to so perform.

Greenfield's position that the contested communication was pertinent to the litigation.

Greenfield's communication with Berkeley, therefore, falls within the purview of the Massachusetts litigation privilege and, unless waived, cannot form the basis for a viable claim of intentional interference with contract relations.

### C. *Loss of the Privilege Through Publication*

Loomco asserts that, even if Greenfield's communication with Berkeley were protected by the litigation privilege, he lost that privilege by "publishing" the communication to Berkeley, a nonparty to the suit. Plaintiff cites several cases in support of this assertion. *See Milford Power Ltd. Partnership v. New England Power Co.*, 918 F.Supp. 471, 475 (D.Mass.1996)(holding that the plaintiff "lost any privilege it might have had by intentionally publishing the statements to defame and extort [the defendant]"); *see also Scott Fetzer Co. v. Williamson*, 101 F.3d 549, 554 (8th Cir.1996)(noting that publication to the news media eviscerates the privilege); *Kleier Advertising, Inc. v. Premier Pontiac, Inc.*, 921 F.2d 1036, 1043–44 (10th Cir.1990)(same); *Asay v. Hallmark*, 594 F.2d 692, 697 (8th Cir.1979)(same).[8] In the cases cited by Loomco for the proposition that dissemination to the public or unrelated third parties nullifies the privilege, the complained-of conduct was actually a recommunication of previously made, but privileged, statements. More specifically, the litigation privilege was lost to those who disseminated to the news media documents already filed with the court, *Bradley v. Hartford Accident & Indemnity Co.*, 30 Cal.App.3d 818, 106 Cal. Rptr. 718 (1973), or who divulged to newspapers letters previously exchanged by the parties. *Scott Fetzer*, 101 F.3d at 554.

■ But, because Greenfield's communication is privileged in the first instance, Plaintiff's publication theory is simply inapposite.

More succinctly, one cannot lose the litigation privilege by "publishing" a privileged communication to the individual to whom that communication was originally made.

### III.

### *CONCLUSION*

For the foregoing reasons, Defendant Mark S. Greenfield's Motion to Dismiss Count Ten of the Amended Verified Complaint is ALLOWED.

An order will issue.

---

8. Plaintiff also cites *Axton–Cross Co., Inc. v. Blanchette*, 2 Mass. L.Rptr. 646, 1994 WL 879570 (Mass.Super. Oct. 17, 1994) for the proposition that the privilege does not apply where the statement is made to one who is not a prospective defendant. Rather than standing for this publication principle, however, *Axton* stood for the proposition that a communication is made preliminary to litigation and is, therefore, privileged, only if the communicator "seriously considered [some] type of judicial proceeding." *Id.* at \*2.