### MARKEY ET AL. *v.* LANGLEY ET AL.

1. Where mortgaged property is sold under a power, the absence of objection on the part of the mortgagor to the sale as made cures any defect which exists therein, and gives it validity.
2. Where the mortgagees are expressly authorized to sell for cash or on credit, they may do either, or combine them in the sale; nor is a sale for part in cash and part on credit under a power requiring it to be made for cash invalid, if the departure from the terms of the power is beneficial to the mortgagor. It is immaterial whether such arrangement for payment is made before or after the sale.
3. Where property, subject to mortgage and other liens, is sold by the first mortgagee, he becomes the trustee for the benefit of all concerned. If he regards the interest of others as well as his own, seeks to promote the common welfare, and keeps within the scope of his authority, a court of equity will in no wise hold him responsible for mere errors of judgment or results, however unfortunate, which he could not reasonably have anticipated.
4. Upon the sale of such property, the liens attach to the proceeds thereof in the same manner, order, and effect as they bound the premises before the sale, the new securities standing in substitution for the old.

APPEAL from the Circuit Court of the United States for the District of South Carolina.

The Kalmia Mills, a corporation under the laws of South Carolina, having commenced the erection of a factory, borrowed from W. C. Langley & Co. of New York, in July, 1866, $150,000 upon a mortgage of its entire property. The notes

given therefor were indorsed by B. F. Evans, president of the company, and by H. Cogswell and B. Mordecai, upon whom devolved the management of the mills, and the entire responsibility for the payment of its debts.

In October, 1866, an additional loan, secured in like manner, was made by Langley & Co. Both mortgages contain covenants, in case of default in the payment of either the principal or interest of the notes, that it should not be necessary to apply to a court for a foreclosure, but the mortgagees should have full power and authority to put the premises into the hands of some good broker and auctioneer, to be sold for cash or credit at their option and direction, at public sale, to the highest bidder, after thirty days' advertisement of the time and place of sale; the surplus from such sale, if any there should be after deducting expenses and the amount of the notes, to be paid to the said Kalmia Mills. To carry into effect this intent, the partners of the firm of Langley & Co. and the survivor were made the attorneys, irrevocable, of the corporation, to convey to the purchaser in fee-simple with such covenants of warranty as are usually inserted in conveyances of real estate; "and, further, to do and perform all and every other act and acts, thing and things, which shall or may be necessary and proper for the full and complete effecting and performing of the covenants and agreements herein contained."

No payment having been made, Langley & Co., on the 16th March, 1867, placed the property in the hands of Wardlaw & Carew, brokers, of Charleston, and duly advertised the same for sale. The terms were declared to be one-third of the purchase-money in cash; the remainder at six, nine, and twelve months, secured by a mortgage on the property.

The corporation seems to have been regarded as practically insolvent by its creditors, as well as by Evans, Cogswell, and Mordecai. The latter determined, in order to save themselves, to purchase the property at the sale. Advised that, being officers of the corporation, it was expedient, if not essential, that they should buy at such a sum as would, with the other assets of the company, be sufficient to pay all its debts, they announced their determination to the creditors to do so. Among them were Markey & Co., the contractors and builders engaged

in erecting the factory, who had a written contract with the corporation prior in date to its said mortgages, but which, not having been recorded at the time they were executed, was not a lien on the building. It was recorded a few days before the sale, and from that date took effect as a lien for no "greater sum than the just value which such building gave to the lands upon which it was erected:" it "impaired no prior lien." 6 Stat. S. C. 32.

Markey & Co., being informed by the counsel of Langley & Co. of the intention of Evans, Cogswell, and Mordecai, to purchase, and having obtained from the latter a guaranty, that, in case they became the purchasers, they would continue the contract, and indemnify them from any loss from the failure of the Kalmia Mills to pay the amount due thereon, made no objections to the sale.

Evans, Cogswell, and Mordecai computed that $20,000, in addition to the assets of the company not covered by Langley & Co.'s mortgages, would suffice to pay the creditors in full, and announced that they were prepared to bid that sum in excess of the mortgage-debts. This intention they communicated to the creditors generally, and explained to Langley & Co. that their purpose was to form a new company, and raise by subscriptions to the capital stock a sufficient amount to pay off all debts, and to put the factory into operation; that, of course, they would be dependent upon indulgence as to payment, and aid to enable them to carry out the intention. Langley & Co., without committing themselves to any definite promise of assistance, expressed a willingness to give any reasonable indulgence as to time, provided adequate security were given. The determination to bid a sum estimated to be sufficient to pay all the creditors, and the announcement to them, were based upon the opinion that Langley & Co. had the *authority* and *power* as well as the willingness to extend to them, if they should be the purchasers and give satisfactory security, more favorable terms as to payment than those formally announced in the advertisement. The sale was made on the 23d of April, 1867, without objection or protest, the auctioneers announcing the terms as advertised, and adding that they were authorized to say that "the purchasers will be

able to negotiate more favorable terms with the sellers, provided it is to their mutual interests." Langley & Co. had the property put up at the amount of the debt due to them. Cogswell, the only bidder, bid $20,000 over and above that amount, and became the purchaser "for and on behalf of himself, Evans, Mordecai, and such other persons as should contribute to the purchase-money, and come in and unite with them in the formation of a new company for the purpose of carrying out the contemplated enterprise."

The result of the sale being announced to Langley & Co., a personal negotiation was entered into between that firm and Cogswell, Evans, and Mordecai. The latter represented that they were unable to comply with the requirement as to the cash payment of $71,445.69, and asked for one year's indulgence, claiming that the expectation of receiving it had induced them to bid in the property. Langley & Co. reiterated their willingness to give it, provided their rights and interests were preserved and protected by additional adequate security.

This negotiation resulted in a written contract between the parties, in which were recited the sale, and the inability of the purchasers to comply with its terms; and it was agreed that Langley & Co. would "accept in payment of the debt due to them this day by the Kalmia Mills under the said mortgages — the following notes of the said Cogswell, Evans, and Mordecai, under seal — one note (for the principal of the said debt) for $180,000, payable on 12th January, 1868, with interest from date; and three other notes (for the interest), each for $4,779.02, payable at five, six, and seven months, with interest from date: and upon execution and delivery of the said notes, and also of another note for the sum of ———— dollars, — which, being for an amount over and above the debt of the Kalmia Mills to Langley & Co., is to be assigned by them to the Kalmia Mills, — the said Langley & Co. will, as the attorney of the Kalmia Mills, execute a conveyance to Harvey Cogswell, in trust, first to pay said notes for the purchase-money, and then in trust for such uses as he and the said Evans and Mordecai shall by deed declare; and will enter satisfaction on the two mortgages of the Kalmia Mills, provided that the said Cogswell, Evans, and Mordecai shall within a reasonable time execute to Langley & Co.

bonds and mortgages of their individual property therein specified, conditioned for the payment of all the notes given for the purchase-money."

This agreement was carried out, and Langley & Co. received the five notes stipulated to be given, — four for the amount of the mortgage-debt; and one for $20,000, which was intended to cover the other creditors, including Markey & Co., and which was assigned to the Kalmia Mills, and delivered to Evans, the president, to be held by him for the benefit of the creditors of said company. Evans, Cogswell, and Mordecai, in pursuance of the agreement, also executed to Langley & Co. a bond of indemnity for $100,000 with the stipulated condition, and mortgages of their individual property to secure it.

Notice of the willingness of Langley & Co. to modify the terms of sale was given openly at the sale; but the modifications above stated were made without. consultation with, and, as far as the evidence shows, without the knowledge of, the other creditors.

The sale having been effected, Langley & Co., on the tenth day of May, 1867, in the exercise of the powers conferred upon them by the mortgages, executed and delivered a conveyance in fee-simple to Harvey Cogswell of the entire property covered by the mortgages *in trust*, out of and from the purchase-money, to pay *first* the costs and expenses of said sale, *then* to pay the several notes given for the purchase-money, and subject to the trusts for the payment of the entire amount of the purchase-money to and for such uses, intents, and purposes, and to and for such person or persons, and in such shares, estates, and proportions, as the said Cogswell Evans, and Mordecai shall by deed declare, limit, and appoint. The deed also contained a proviso, that in case of default of payment to the said Langley & Co. of the notes given for the purchase-money, or any or either of them, they should sell the mortgaged property without application to any court, and pay the notes from the proceeds. This deed having been duly recorded, the purchasers entered into possession, and carried on the work upon the factory. Markey & Co. having, on the 11th of June, 1867, entered into an agreement with Cogswell, trustee, stipulating for the payment of $18,000 for the work already done, and to be done,

by them, continued work under their contract, and received payments from time to time therefor. The purchasers discharged several debts due to operatives and other creditors of the Kalmia Mills, in all amounting to $16,674.21. They credited these payments on the $20,000 note, the amount of which had been made up by including the debts thus paid; and it is claimed that the payments should go to the extinguishment of the note, still leaving debts of the Kalmia Mills unpaid, amounting to $22,433.08. Many new debts were also contracted by Cogswell, trustee, in the course of the year during which the effort was made to carry on the enterprise. The purchasers failed in their attempt to form a new company; and, none of the notes given by them having been paid, they, in January, 1868, requested Langley & Co. to take possession of and sell the entire property conveyed by them to Cogswell, trustee, and also the individual property mortgaged to them, to make up any loss that they might sustain on the sale of the mill property. Langley & Co., accordingly, under the powers given to them, and in compliance with the prescribed terms, advertised the mill property for sale in Charleston on the 19th March, 1868.

Markey & Co. and other creditors of the Kalmia Mills opposed the sale, and threatened proceedings in the State court to enjoin it. Langley & Co. thereupon filed their bill in the Circuit Court, setting up their rights, and praying an injunction against proceedings on the part of the creditors to stop or interfere with the sale. Answers were filed; and Markey & Co. filed a cross-bill, praying that the sale be enjoined.

While the cases were under consideration, and before the argument was concluded, the day of sale arrived; and an order was made by consent, that the sale by Langley & Co., under their power, should proceed, " provided that the said property at said sale be not sold for a sum less than $160,000, and that $40,000 of the credit portion of the purchase-money be retained to stand in place of the property, and subject to the liens and equities of the several parties, and subject to the further order of the court."

William C. Langley became the purchaser for $160,000; and the sale was confirmed by the court, with the same condition

and proviso as to the $40,000 which was made a charge upon the property purchased by him. Langley having sold the mill property to the Langley Manufacturing Company, which has since completed the factory and put it in successful operation, an order was subsequently made by the court releasing the land from the said charge, and substituting instead his bond with approved sureties, conditioned for the payment of such portions of the purchase-money into court as it should order, not exceeding the sum of $40,000.

By order of court, with the consent of all parties, Langley & Co. proceeded to sell the individual property of Evans, Cogswell, and Mordecai, mortgaged to them to secure the bond of indemnity, and received therefrom $52,148.

The court below decreed that the arrangement made between the purchasers at the sale in 1867 and Langley & Co. was within the scope of the power, authority, and duty of the latter, and binding upon all parties; that their right to priority of payment out of the purchase-money accruing from the sale in 1868 was not waived, and that they were entitled to be paid in full before any of the creditors, either of the Kalmia Mills or of the purchasers in 1867, should receive any portion thereof; that the note for $20,000 did not rank *pari passu* with the notes for the rest of the purchase-money secured by the trusts of the conveyance by Cogswell; and dismissed the cross-bill.

Markey & Co. thereupon appealed to this court.

*Mr. Samuel Lord, Jr.*, and *Mr. James Lowndes*, for the appellants.

Sufficient having been realized by the first sale of the property to pay both the liens of the appellees and the appellants, they were transferred to that fund, and continued upon it in the same order in which they subsisted on the premises previous to the sale. This is the settled rule of equity; and the mortgagees, having notice of the lien of the appellants, were bound to apply the fund as would a court of equity. *Olcott* v. *Bynum*, 17 Wall. 63.

The appellants insist that the appellees' control of the terms of sale ended when the property was knocked down to Cogswell, except for the purpose of executing a conveyance and receiving the purchase-money. But this the mortgagees could

not do; for a power to sell at public auction cannot be executed at private sale. *Greenleaf* v. *Queen*, 1 Pet. 138. Nor can property bound by two mortgages be sold under the first, so as to discharge the lien of the second, unless the holder of the latter be made a party.

The undisputed facts as to the arrangement referred to do not sustain the legal conclusion based upon them. That the departure from the terms of a specially delegated power cannot be justified upon the plea that the principal would be benefited thereby was expressly ruled in *Greenleaf* v. *Queen, supra.*

The appellants were *sui juris*, resided in the State, and were represented by counsel, who had conducted the negotiations preceding the sale. Upon what ground, then, could the appellees be justified in assuming to act for them, and determine what was best calculated to "protect their rights and further their interests"?

If the doctrine of the court below, in sustaining the transaction upon the ground "that it would have been sanctioned by the court if application had then been made to confirm it," be correct, it follows that the extent of a power depends, not upon the terms employed in its creation, but upon the arbitrary will of the court. There is no such principle in law; for the court had no power to sanction a departure from the terms and conditions of the instrument under which the appellees were acting. *Dolan* v. *The Mayor of Baltimore*, 4 Gill, 405.

Equity may aid a defective execution of powers, when the defect is only formal; but it cannot supply a defect in substance. *Piat* v. *McCullough*, 1 McLean, 69.

If the position we have assumed is untenable, it is submitted that the note for $20,000 is entitled to share *pari passu* with all the other notes in the proceeds, not only of the mill, but of the other property.

The sale in 1867 and the acceptance of the notes of the purchasers by the appellees extinguished their mortgage-debt, and with it the priority to which they had been entitled. 2 Hilliard on Mort., c. 36, sect. 1; *Dooley* v. *Hays*, 17 S. & R. 400; *Mohler's Appeal*, 5 Burr. 418; *Hancock's Appeal*, 34 Penn. 156.

*Mr. Ch. Richardson Miles, contra.*

The mortgage gave the mortgagees no power to vacate or abandon a sale made at auction, or to vary its terms. The arrangement made between them and the purchasers, after the sale, was not, therefore, within the scope of their power. 1 Hilliard, 138.

The rule is settled, that, in determining the extent of a power, the intention of the parties in its creation must constitute the guide. In the case at bar, the very nature of the power rendered its exercise necessary before the sale. *Montague* v. *Dawes*, 14 Allen, 369.

The mortgagees were not made the agents of the mortgagors for the purpose of a sale. Their power was studiously limited to the selection of a " good broker or auctioneer."

If the power to change the terms of sale, so as to bind the junior incumbrancers, existed at all, the conclusion is irresistible, that it was without limit so long as the mortgagees acted in good faith.

If the parties to a contract of sale which is still executory in any manner add to, subtract from, vary or qualify, its terms, the legal effect thereof is to rescind the original contract, and substitute a new one in its place. If new terms could be substituted, so could new prices or new qualities. *Stead* v. *Dawber*, 10 Adol. & Ell. 57; *Marshall* v. *Lynn*, 6 Mees. & Wels. 109.

If, then, the agreement be regarded as a change in the terms of sale, and binding on all parties having an interest in the proceeds, its legal effect was, necessarily, to annul the public sale, and make a private one of the mortgaged premises.

MR. JUSTICE SWAYNE delivered the opinion of the court.

The statement of facts agreed upon by the counsel of the parties has abridged our labor in this case. We shall confine our remarks to the points, which, in our judgment, require consideration, referring to the facts only so far as is necessary for the elucidation of our views.

The validity of the two mortgages executed to Langley & Co., by the corporation known as the Kalmia Mills, is not questioned; nor can it be doubted that the power to sell, which they contained, was sufficient to warrant the sale of the mortgaged premises in the manner prescribed. *Olcott* v. *Bynum*,

17 Wall. 63.   The good faith of Langley & Co. in making the sale, and of Cogswell, Evans, and Mordecai in making the purchase, are undisputed.   No ground is disclosed for doubt as to either of these points.   All concerned acquiesced at the time, and were apparently satisfied.   This litigation has grown out of the large and unexpected depreciation of the property upon which both the appellants and appellees supposed their debts were abundantly secured, and out of the proceeds of which they expected to be paid, if a sale became necessary.

Upon the default of the mortgagor, the mortgages gave the mortgagees authority " to put the mortgaged premises into the hands of some good broker and auctioneer, to be sold for cash or credit, at the option and direction of the mortgagees, at public sale to the highest bidder, according to the custom of vendue, after advertising " as directed ; and, further, " to do and perform all and every other act and acts, thing and things, which shall or may be necessary and proper for the full and complete effecting and performing of the covenants and agreements herein contained."

The terms of sale advertised were a cash payment of one-third of the amount bid, and the balance in six, nine, and twelve months, secured by notes and a mortgage upon the premises.   At the sale, the auctioneers announced that they were authorized to state " that the purchasers would be able to negotiate more favorable terms with the sellers, provided it was to their mutual interests."

The property was sold to Cogswell, for himself, Evans, and Mordecai, upon a bid of the amount due Langley & Co., and $20,000 in addition.   One-third of the amount bid to be paid in cash was $71,445.69.   The buyers thereupon represented to Langley & Co. that it was impossible for them to make the cash payment, and asked for indulgence, and a change of the terms of the sale with respect to the times when the payments were to be made.

Langley & Co., rather than re-advertise the property and take the risk incident to offering it for sale again, entered into an agreement with the purchasers, whereby it was stipulated as follows : —

That the purchasers should give to Langley & Co. their four

several promissory notes, one for $180,000, payable on the 12th of January, 1868 (being for the principal of the debt then due to them), with interest; and three others, each for $4,779.92, payable respectively at five, six, and seven months, with interest (being for interest then due on the principal debt) ; and, in addition, another note for $20,000, payable with interest on the 3d of April, 1868.

The title to the mortgaged premises was to be conveyed to Cogswell, first to pay the several notes for the purchase-money, and then in trust for such uses and purposes as Cogswell, Evans, and Mordecai should appoint. They were also to give to Langley & Co. their bond, secured by several mortgages upon their individual property, conditioned to pay any residuum that might be left due on the notes after exhausting the property covered by the deed of trust to Cogswell. This agreement was in all things carried out by the parties. The note of $20,000 was intended to meet the liabilities of the Kalmia Mills to its creditors, other than Langley & Co. The debt due to Markey & Co. was one of those intended to be thus provided for.

A few days before the sale, Markey & Co. put on record a contract with the Kalmia Mills, under which they had been working upon the mortgaged premises. This gave them a mechanics' lien. They threatened to enjoin the proceedings to sell by Langley & Co. Cogswell, Evans, and Mordecai thereupon gave them a guaranty, that, if the guarantors became the purchasers of the premises, they would continue the contract under which Markey & Co. had been working, and indemnify them against any loss arising from the Kalmia Mills failing to pay the amount due on the contract. This being arranged, Markey & Co. interposed no obstacle to the sale. After the sale, they entered into a contract with Cogswell, the trustee, whereby it was stipulated that they should be paid the sum of $18,000 for their work done and to be done. They continued to work under this contract, and received payments from time to time.

The enterprise in which Cogswell, Evans, and Mordecai had engaged, with the premises they had bought as its basis, having failed, they requested Langley & Co. to take possession of the premises conveyed by the trust-deed to Cogswell, and of the premises covered by the mortgages given by Cogswell, Evans,

and Mordecai, and to proceed to sell under the powers contained in those instruments. Langley & Co. thereupon advertised the Kalmia Mills property to be sold on the 10th of March, 1868. Markey & Co. and other creditors threatened to interpose by injunction. Langley & Co. thereupon filed this bill to settle their rights and those of the adverse parties. On the day fixed for the sale, the Kalmia Mills property, by consent of parties, was bought by Langley for $160,000. Forty thousand dollars of the fund was reserved by order of the court to await the result of this litigation. Subsequently, by the like consent of parties, the property mortgaged by Cogswell, Evans, and Mordecai was sold, and yielded the net sum of $52,148. The proceeds of both sales were less than sufficient to satisfy the amount due Langley & Co. by $6,152.13, leaving nothing to be applied to any other liability of the Kalmia Mills.

The contest in the court below was as to the application of the proceeds of these sales. The defendants claimed that Langley & Co. should be charged with the amount of the cash bid of Cogswell at the sale under the original mortgages, $71,449.69, as so much paid to them, because they had no right to waive its payment at the time of the sale, and include it in the notes given for the purchase-money.

This, if done, would leave a residuum of the proceeds of the sales large enough to pay the balance due Langley & Co., and also the amount due on the trust-note of $20,000. Failing this, the defendants insisted that this note should be paid out of the proceeds of the Kalmia Mills property, and of the property mortgaged by Cogswell, Evans, and Mordecai severally, *pro rata* with the other notes given for the purchase-money.

The court below decided against them upon both points. Here the same propositions have been urged upon our attention.

The first one cannot be maintained, for several reasons.

The mortgagor makes no objection to the sale as made. If it were defective, this would cure the defect, and give it validity. *Taylor's Admr.* v. *Chowning*, 3 Leigh, 654; *Benham et al.* v. *Rowe et al.*, 2 Cal. 387. If the power require the sale to be for cash, and it is made for part cash and part credit, the departure from the power is beneficial to the mortgagor, and the sale is valid. *Hubbard* v. *Jarrell*, 23 Md. 75. When the

power is to sell for cash, and the sale is made accordingly, the mortgagee may allow time for the payment of the purchase-money; and whether this arrangement is made before or after the sale is immaterial. *Mahone* v. *Williams*, 39 Ala., N. S. 202.

Where mortgaged premises were offered for sale for cash under a power which required the sale to be so made, they were struck off for $2,375. The purchaser tendered $1,200 cash, and offered to give any security that might be required for the payment of the balance when the sale was confirmed. The mortgagee declined to receive the money and the security, as not in conformity with the terms of the sale. The property was offered for sale again, and bought by the mortgagee for $1,600.

The court said, —

" In determining upon the approval or rejection of the sale in such cases, the true question to be considered is, not so much whether there has been *a literal or technical, as a fair and reasonable, compliance with the terms of sale*, and a *bona fide* disposition of the property.

" Without intending to charge the mortgagee in this case with the wilful violation of his trust, the circumstances disclosed by the proof show reasonable ground for the inference that he misapprehended the nature of his duty as trustee, which required *an advantageous sale of the property for the benefit of all the parties interested.*"

The sale was vacated. *Horsey* v. *Hough*, 38 Md. 139. See also *Gibson's Case*, 1 Bland, Ch. 144; *Olcott* v. *Bynum*, 17 Wall. 63.

Where a power coupled with a discretion has been exercised, a court of equity, in the absence of fraud, very rarely interferes. *Olcott* v. *Bynum*, *supra*.

In this case, the mortgagees were expressly authorized to sell for cash or on credit. This gave them authority to do either, or to combine them in the sale. What was done was a simple exercise of the discretion with which they were clothed. It was in pursuance of the notice given at the vendue. It was intended to promote the sale of the premises upon the best terms that could be procured. Such an exercise of the power was as

competent after as before the property was struck off.   In this respect, the power is without restriction.   The arrangement was apparently greatly beneficial to Markey & Co. and the unsecured creditors, as well as to Langley & Co.   It does not appear that there was any bidder but the purchasers.   It is clear that they could not have made the cash payment.   If insisted upon, the sale would have fallen through.   Besides the mortgaged premises, a large amount of additional property was pledged for the payment of the purchase-money.   The light thrown backward by subsequent events shows clearly that it was the only way to secure the payment of the debt due to Langley & Co., and leave any thing for the other creditors.   The arrangement seemed to furnish the means of satisfying all demands.   That it failed to do this was not the fault of Langley & Co.

A mortgagee, in such circumstances, is a trustee for the benefit of all concerned.   He must regard the interests of others as well as his own.   He should seek to promote the common welfare.   If he does this, and keeps within the scope of his authority, a court of equity will in no wise hold him responsible for mere errors of judgment, if they have occurred, or for results, however unfortunate, which he could not reasonably have anticipated.   *Hext* v. *Porcher*, 1 Strob. Eq. 172.

The second proposition is also untenable.

The liens of the mortgages and the mechanics' lien attached to the proceeds of the sales in the same manner, in the same order, and with the same effect, as they bound the premises before the sales were made.   *Astor* v. *Miller and Others*, 2 Paige, 68; *Sweet* v. *Jacobs*, 6 id. 355; *Brown* v. *Stewart*, 1 Md. Ch. Decis. 87; *Olcott* v. *Bynum*, 17 Wall. 63.

In the view of equity, the new securities stood in substitution for the old ones; the liens of Langley & Co. being prior in point of time to all others, and first to be paid.   As the case is developed in the record, such appears plainly to have been the intent of the parties.   The note of $20,000 was the last to mature.

If the sale to Cogswell had been made by a master or a trustee other than those named in the power of sale, for cash or on credit, the money, when received, would have been paid over according to the priorities of the liens of the parties entitled to receive it.   Langley & Co. would have been first paid.

The fact that the sale was made by the mortgagees, acting as trustees and performing the functions of a master, does not change the principle involved, nor affect its application.

It appears that a question was raised in the court below as to the right of the unsecured creditors of the Kalmia Mills to share with Markey & Co. in the proceeds of this note. As there can be no such proceeds, we need not consider that subject.            *Decree affirmed.*