UNITED STATES of America, Plaintiff,

v.

ROCKLAND TRUST COMPANY (As successor Middleborough Trust Company), Defendant/Third Party Plaintiff,

v.

Carlton C. GIFFORD and Lloyd Earl Belford, Third Party Defendants.

Civ. A. No. 93–10674–DPW.

United States District Court,
D. Massachusetts.

June 17, 1994.

John V. Cardone, U.S. Dept. of Justice, Tax Div., Washington, DC, for U.S.

Daniel E. Goldrick, Pamela E. Karmazine, Fagan & Goldrick, Taunton, MA, for Rockland Trust Co.

Carlton C. Gifford, Wareham, MA, for Carlton C. Gifford.

Andrew M. Higgins, Casner & Edwards, Boston, MA, for Lloyd Earl Belford.

## MEMORANDUM AND ORDER

WOODLOCK, District Judge.

The United States commenced this action to recover an amount, calculated with interest as of this day to be $92,255.11 from the defendant/third-party plaintiff Rockland Trust Company ("Rockland"). The United States alleges that Rockland failed or refused to surrender property or property rights of third-party defendant Carlton C. Gifford, which was subject to an Internal Revenue Service ("IRS") levy. Presently before me is a summary judgment motion by the United States against Rockland and a motion by third-party defendant Lloyd Earl Belford, Gifford's former attorney, to have the claims brought against him by Rockland dismissed pursuant to Fed.R.Civ.P. 12(b)(6). For the reasons set forth below, I will grant the summary judgment motion and allow the motion to dismiss.

## I.

### Background

Rockland (formerly the Middleborough Trust Company) was the holder of a real estate mortgage given it by Gifford in 1982. In March 1988, Rockland foreclosed on the mortgaged property for breach of condition. On April 6, 1988, the IRS served a Notice of Levy on Rockland's agents, indicating tax liabilities on Gifford's part in the amount of $51,675.91. *See* Plaintiff's Exh. 2. On April 8, 1988, Rockland's agents advised the IRS that the foreclosure was in progress and, upon Rockland's receipt of funds, any surplus would be "turned over to the Land Court on an interpleader basis." *See* Plaintiff's Complaint at 4, ¶ 12.

At auction, the property sold for $205,000.00, which, after satisfaction of indebtedness, left Rockland with a surplus of $73,029.74. *See* Amended Third–Party Complaint at ¶¶ 11–12.[1] Confronted with the competing claims of "several junior lienholders" for these funds—the United States among them—Rockland filed a complaint in interpleader with the Plymouth County Superior Court on May 18, 1988.[2] The United States was not properly served in the interpleader action, however, until September 27, 1989, more than a year after the initial filing.[3]

On or about June 3, 1988, according to Rockland, "Third Party Defendant Carlton

1. Rockland's agents received $180,000 of the proceeds from the foreclosure sale on April 20 and another $25,000 on May 4, 1988. *See* Plaintiff's Exh. 5, Defendant's Answers to Interrogatories, Answer to Interrogatory 4. Of the $205,000 total, Rockland retained $119,574 to satisfy its mortgage, $7,944 as costs of sale, and $4,451 as fees to its agents. *See* Plaintiff's Exh. 6.

2. Rockland asserts that, on account of the conflicting lienholder claims, it "had no authority to disburse any surplus funds" from the foreclosure sale absent judicial determination. Def.'s Mem. in Opp. to Mot. for Summary Judgment, ¶¶ 13, 14; Original Third–Party Complaint, ¶ 14.

   The parties-defendant listed in the interpleader action were: 1) Gifford, the mortgagor; 2) the Fairhaven Institution for Savings, a 1970 mortgage holder; 3) Arthur G. Gamache, a holder of two 1980 mortgages; 4) J.A. Stinson, with a $4,500 attachment from 1984; 5) the Commonwealth of Massachusetts, Department of Revenue, with various tax liens from 1984 through 1986 totalling approximately $16,500; and 6) the IRS, with the claim presently at issue. *See* Def.'s Exh. 4 (copy of interpleader complaint, *Middleborough Trust Co. v. Carlton C. Gifford, et al.*, Case No. 88–0897 (Byron, J.)—Note: Paragraph 16 of the interpleader complaint mistakenly re-

fers to the United States as the Commonwealth of Massachusetts).

3. Specifically, the United States demonstrates with support from Rockland's admissions that "the defendant did not send copies of the process and complaint, by registered mail, or by certified mail, to the Attorney General of the United States at Washington, D.C. ... [n]or did the defendant serve the United States Attorney for the District of Massachusetts with copies of the process and complaint, until September 27, 1989". Plaintiff's Mem. in Support of Summary Judgment, ¶¶ 17–18; Plaintiff's Exh. 4, Def.'s Answer to Requests for Admission 6 and 7. Thus Rockland failed to comply with the method of service required under 28 U.S.C. § 2410, which in relevant part states:

   § 2410. Actions affecting property on which United States has lien

   .    .    .    .    .

   (b) ... In actions in the State courts service upon the United States shall be made by serving the process of the court with a copy of the complaint upon the United States attorney for the district in which the action is brought or upon an assistant United States attorney or

C. Gifford retained the services of Third Party Defendant Lloyd Earl Belford for the purpose of filing a voluntary Chapter Thirteen bankruptcy petition · with the United States Bankruptcy Court, District of Massachusetts—Docket no. 88–10996–JNG." Amended Third–Party Complaint, ¶ 13. Rockland asserts that this bankruptcy petition was signed by both Gifford and Belford and "contained a complete list of [Gifford's creditors], including the [IRS] and [Rockland]." *Id.*, ¶ 14. Also on June 3, Gifford and Belford "filed a Suggestion of Bankruptcy with the Plymouth County Superior Court informing all parties, including [Rockland] and the [IRS,] of [ ] Gifford's pending Chapter Thirteen Bankruptcy." *Id.*, ¶ 19. In November 1988 "Belford filed a dismissal of [ ] Gifford's voluntary Chapter Thirteen petition with the United States Bankruptcy Court, which dismissal was ultimately allowed by said Court." *Id.*, ¶ 20.[4]

On December 2, 1988, Gifford, again through his attorney Belford, filed a motion for summary judgment in the interpleader action, asserting his entitlement to the surplus funds and falsely asserting in his "Argument" the following:

> The defendant states to the Court that all of the other defendants listed [in the caption] have in fact, been satisfied in full and have no interest in surplus funds held by the [Middleborough Trust Company].

Mem. in Support of Mot. to Dismiss of Third–Party Defendant, Lloyd Earl Belford ("Belford's Mem.") at 2.[5] The United States notes it was never properly served with notice of this motion. *See* Plaintiff's Mem., ¶ 19.[6] In any event, there being no opposition, the Superior Court granted the motion on January 31, 1989, ordering that the surplus funds be turned over to Gifford.

---

clerical employee designated by the United States attorney in writing filed with the clerk of the court in which the action is brought and by sending copies of the process and complaint, by registered mail, or by certified mail, to the Attorney General of the United States at Washington, District of Columbia.

Rockland asserts that on May 20, 1988, both the IRS Chief of Special Procedures Staff and the IRS District Director were served with a copy of the summons and complaint in interpleader, and that on May 26, 1988, the United States Attorney General was similarly served, by a special process server. *See* Def.'s Exhs. 14–17; Plaintiff's Exh. 5, Def.'s Answer to Interrogatory (6). Rockland further asserts that a) at all relevant times the IRS/United States had actual knowledge of the complaint in interpleader and b) the September 27, 1989 service which the plaintiffs claim was their first was actually a re-service made only at their request. *See* Def.'s Exh. 17, Affidavit of Def.'s Attorney Daniel E. Goldrick, ¶ 5.

Suffice to say that § 2410 does not recognize mere constructive or even actual knowledge of pending actions but rather, recognizing the potential for disputes regarding service on a diffuse bureaucratic institution, requires the careful observation of certain formalities. Because Rockland initially neglected to observe those formalities, service on the United States did not become effective until September 27, 1989.

4. The fact of the bankruptcy proceeding—and the matters pertaining thereto—was not asserted by Rockland in its original Complaint or Memorandum; nor has Rockland submitted any record evidence of same. Rockland now claims that "[t]he creditors, including [Rockland], relied on the information provided by [Gifford and Belford] in the bankruptcy petition as to the number of secured/unsecured creditors and amounts owed to each." Amended Complaint, ¶ 42. Rockland fails to clarify, however, precisely how and when it came upon the information thus relied upon.

5. As part of his defense, Belford contends that because the statement asserting that the creditors had been satisfied was given in the paragraph labeled "Argument" and not in the paragraph labeled "Facts", there was no factual misrepresentation. *See* Belford's Mem. at 9. This contention, of course, is specious. The assertion, wherever located within the headings dividing Belford's brief, purported to be and was a statement of fact.

6. The United States observes that "[t]he motion was mailed to an IRS service center that has no responsibility for the conduct of litigation." Plaintiff's Mem. at 8 n. 1 (citations omitted). In this connection, third-party plaintiff Rockland notes that in addition to misrepresenting the status of the junior lienholders in the "Argument" of their summary judgment motion, the third-party defendants also misrepresented, by filing a Certificate of Service, that all parties had been properly served with notice of the motion, and that both of these misrepresentations were perpetrated in order "to induce Rockland [ ] not to act upon [the motion] by filing any opposition or informing the Court that a Notice of Levy that [sic] had been served upon it by the United States of America." Amended Third–Party Complaint, ¶¶ 55, 56.

On October 27, 1989, the United States (after having been "re-served" the month prior, *see* note 3 *supra,*) removed the interpleader action to the United States District Court. Upon subsequent motion by Rockland, the District Court ordered Gifford on September 18, 1990, to return the surplus funds. Following Gifford's failure to comply with this order, the District Court dismissed the interpleader action without prejudice in or around March 1991.

On March 25, 1993, the United States filed the instant Complaint, asserting that, because Rockland had notice of the tax levy on Gifford as early as April 6, 1988, Rockland's failure to honor that levy following its receipt of the foreclosure sale proceeds on May 20, 1988, renders it liable to the United States pursuant to 26 U.S.C. § 6332(d)(1) for a sum equal in value to the property or property rights it failed then to surrender, plus costs and interest.[7]

Along with its Answer to the Complaint of the United States, Rockland filed a Third–Party Complaint against Gifford and Belford on April 15, 1993; an Amended Third–Party Complaint was filed December 15, 1993, asserting counts of fraud (Count I) and of negligence (Count II).[8] In support of these Counts, Rockland alleges that a) it had no authority to disburse funds absent a judicial determination, b) it played no part in the summary judgment motion which resulted in the Superior Court's release of the funds to Gifford, c) Gifford and Belford not only failed to serve the United States with process regarding said motion, but, by the "false and fraudulent" statement therein, knowingly misrepresented the status of the lienholders so as to mislead the court into disbursing the funds to them. Consequently, Rockland maintains, Gifford and Belford are solely responsible for the inappropriate disbursement; Rockland further asserts that Gifford is responsible for payment of his own tax liability.

## II.

### *The Summary Judgment Motion of the United States*

Under Fed.R.Civ.P. 56, summary judgment must be granted "where the pleadings, depositions, answers or interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Goldman v. First Nat'l Bank of Boston,* 985 F.2d 1113, 1116 (1st Cir.1993) (citing Fed. R.Civ.P. 56(c)). In reviewing such materials, I must view all the facts "in the light most favorable to the non-moving party and indulge all inferences advantageous to that party, provided they arise reasonably from the record." *Villanueva v. Wellesley College,* 930 F.2d 124, 127 (1st Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 181, 116 L.Ed.2d 143 (1991).

It is undisputed that 1) third-party defendant Gifford had outstanding federal tax liabilities,[9] 2) Rockland received a notice of levy regarding the same on April 6, 1988,[10] and 3) Rockland's foreclosure upon Gifford's property yielded surplus funds in the amount of $73,029.74. What is disputed is whether Rockland's failure to surrender to the IRS that portion of the surplus funds levied upon renders it now liable for an equivalent sum.[11]

---

7. *See* Plaintiff's Complaint at 6, ¶¶ 25–27.

8. The Amended Complaint thus drops the third count in the original complaint for indemnification/contribution.

9. *See* Plaintiff's Exh. 1.

10. *See* Plaintiff's Exh. 2.

11. The IRS's basic authority to collect unpaid taxes by means of a levy is found in 26 U.S.C. § 6331, which provides in pertinent part:
    § 6331. Levy and distraint
    (a) Authority of Secretary.—If any person liable to pay any tax neglects or refuses to pay the same within 10 days after notice and demand, it shall be lawful for the Secretary to collect such tax (and such further sum as shall be sufficient to cover the expenses of the levy) by levy upon all property and rights to property (except such property as is exempt under section 6334) belonging to such person or on which there is a lien provided in this chapter for the payment of such tax.
    . . . . .
    (b) Seizure and sale of property.—The term "levy" as used in this title includes the power of distraint and seizure by any means. Except as otherwise provided in subsection (e), a levy shall extend only to property possessed and obligations existing at the time thereof.

In support of its position, the United States cites 26 U.S.C. § 6332, which, as relevant here, provides:

§ 6332. Surrender of property subject to levy

(a) Requirement.—Except as otherwise provided in this section, any person in possession of (or obligated with respect to) property or rights to property subject to levy upon which a levy has been made shall, upon demand of the Secretary, surrender such property or rights (or discharge such obligation) to the Secretary, except such part of the property or rights as is, at the time of such demand, subject to an attachment or execution under any judicial process.

. . . . .

(d) Enforcement of levy.—

(1) Extent of personal liability.—Any person who fails or refuses to surrender any property or rights to property, subject to levy, upon demand by the Secretary, shall be liable in his own person and estate to the United States in a sum equal to the value of the property or rights not so surrendered, but not exceeding the amount of taxes for the collection of which such levy has been made, together with costs and interest. . . .

Pursuant to this statute, where the taxpayer's property levied upon is held by a third party, service of notice of the levy upon that third party "gives the IRS the right to all property levied upon and creates a custodial relationship between the person holding the property and the IRS so that the property comes into the constructive possession of the Government." *U.S. v. Nat'l Bank of Commerce*, 472 U.S. 713, 720, 105 S.Ct. 2919, 2924, 86 L.Ed.2d 565 (1985) (citation omitted). Thus, "[i]f . . . the custodian refuses to honor the levy, he incurs liability to the Government for his refusal." *Id.* at 721, 105 S.Ct. at 2924.

■ Rockland raises several defenses to this putative liability. First, noting that it did not come into full possession of the surplus funds until May 4, 1988, it claims that it was not "in possession of (or obligated with respect to)" the property levied upon at the time of the April 6, 1988 notice. I find this claim unpersuasive. The auction of Gifford's mortgaged property was completed by April 1, 1988. *See* Plaintiff's Exh. 7 (affidavit describing results of auction). Hence, as the United States observes, "[a]s a result of the foreclosure sale, the proceeds were due and owing to the defendant. . . . It was this established right to the surplus proceeds that the United States seized by levy." Plaintiff's Mem. at 14.

Elaborating the argument, Rockland contends that a) even if it thus had possession of the surplus funds, those funds were subject to competing claims; b) until those claims were settled and it was determined exactly how much belonged to whom, the funds could not properly be considered the property of the third-party defendant Gifford; c) having properly submitted both the funds and the competing claims for judicial disposition in interpleader, Rockland was never in possession of the taxpayer's property and so cannot be held liable for a failure to comply with the levy thereon. Rockland further contends that turning over the disputed funds to the IRS instead of instituting the interpleader action would have subjected it to multiple liability.

The United States fully rebuts these contentions. Noting that " '[i]n the application of a federal revenue act,' state law controls in determining the nature of the legal interest which the taxpayer had in the property", *Nat'l Bank of Commerce*, 472 U.S. at 722, 105 S.Ct. at 2925 (citations omitted),[12] the United States correctly contends that under Massachusetts law, Gifford was entitled to any surplus funds from the foreclosure sale, and that the funds therefore were legally his property. This is established Massachusetts law: "Upon [a foreclosure] sale the former owner of the equity becomes entitled to any

---

**12.** " '[O]nce it is determined that state law creates sufficient interests in the [taxpayer] to satisfy the requirements of the [§ 6332], state law is inoperative,' and the tax consequences thence-forth are dictated by federal law." *Nat'l Bank of Commerce*, 472 U.S. at 722, 105 S.Ct. at 2925 (citations omitted).

surplus of the amount received from the sale in excess of the amount due upon the obligation secured by the mortgage." *Goldman v. Damon,* 272 Mass. 302, 172 N.E. 226, 227 (1930).

Rockland asserts, however, that junior lienholders also have an entitlement to such surplus funds and that their interests must be satisfied before the mortgagor receives payment, thus obscuring the mortgagor's legal interest in the funds: "[A] junior lienor has an interest in the proceeds of the [foreclosure] sale and is entitled to any surplus to the extent of that interest as against the mortgagor." *Pioneer Credit Corp. v. Bloomberg,* 323 F.2d 992, 993–94 (1st Cir.1963) (citing, *inter alia, Markey v. Langley,* 92 U.S. 142, 23 L.Ed. 701 (1875); *Pilok v. Bednarski,* 230 Mass. 56, 119 N.E. 360 (1918); *Andrews v. Fiske,* 101 Mass. 422 (1869)). Given that the claim of a junior lienholder may thus prevail over a mortgagor's interest, Rockland contends that the competing claims for the instant surplus funds rendered Gifford's "property rights" therein—or at least the extent of those rights—merely speculative.

A somewhat analogous argument confronted the Supreme Court in *Nat'l Bank of Commerce.* In that case, the defendant bank claimed that funds in a taxpayer's account held jointly with two other persons could not be subject to a § 6332 levy because it was undetermined how much, if any, of the deposited funds was actually the "property" of the taxpayer. However, the Court rejected this argument: "That another party or parties may have competing claims to the accounts is not a legitimate statutory defense." 472 U.S. at 727, 105 S.Ct. at 2927.

*Nat'l Bank of Commerce* may be distinguished in that the taxpayer in that case had

an "unrestricted right to withdraw funds from the account", a power the Court found plainly "qualified as a right to property for purposes of §§ 6331 and 6332." *Id.* at 725, 105 S.Ct. at 2926. In the instant case, the mortgagor apparently has no such unfettered access or right to the surplus funds. In contrast to the otherwise equal and independent status of the joint account holders in *Nat'l Bank of Commerce,* however, the claims of any competing lienholders in the present situation only exist to the extent that the surplus funds can be considered the property of the mortgagor, for it is only the mortgagor's obligation that gives rise to their claims, and only some property right of his that can answer for them. The mortgagor thus evidently has *some* property interest in the surplus funds, and that interest appears sufficient to fall within the purview of the statute at issue:

> The statutory language "all property and rights to property," appearing in § 6321 (and ... essentially, § 6332(a)[ ] ) is broad and reveals on its face that Congress meant to reach every interest in property that a taxpayer might have.

*Nat'l Bank of Commerce,* 472 U.S. at 719–20, 105 S.Ct. at 2923–24. To this extent, then, Gifford's property interest in the surplus funds appears unambiguous.[13]

With the property interest established, both the statute and the Supreme Court make clear "that a bank served with a notice of levy has two, and only two, possible defenses for failure to comply with the demand: that it is not in possession of the property of the taxpayer, or that the property is subject to a prior judicial attachment or execution." *Id.* at 727, 105 S.Ct. at 2927. I have rejected the defense of lack of possession in the dis-

---

**13.** The *Nat'l Bank of Commerce* majority justified this result by underscoring that "§ 6331 is a provisional remedy, which does not determine the rights of third parties until after the levy is made":

> [T]he levy does not purport to determine any rights to the property. It merely protects the Government's interests so that rights to the property may be determined in a postseizure proceeding. It is in those proceedings that the rights of any who claim an interest to the property are punctiliously protected.

*Id.* at 731 and n. 15, 105 S.Ct. at 2930 and n. 15. *But compare id.* at 747, 105 S.Ct. at 2938, Justice Powell writing for a four-justice dissent ("one would hardly characterize as "provisional" the Government's taking of an innocent party's property without notice, especially when, *even if the* taking is discovered, the burden is then on the innocent party to institute recovery proceedings").

cussion above; as for judicial attachment or execution, the record discloses one judicial attachment under Massachusetts law against the foreclosed property in the amount of $4,500. *See* note 2, *supra.* As the United States observes, however, the foreclosure yielded a surplus of approximately $73,000 as against tax liabilities of approximately $51,000. *See* Plaintiff's Mem. at 12, n. 9. Hence this single attachment is an inadequate defense for Rockland's failure to comply with the levy.

As for Rockland's assertion that to have complied with the levy would have subjected it to multiple liability on other fronts, I note that 26 U.S.C. § 6332(d), in effect at the time of the April 1988 levy in this case, clearly exempted one who surrendered or paid property or property rights in compliance with a levy from liability to the "delinquent taxpayer".[14] Whether this might have extended to protect Rockland from claimants whose basic claim would have been against the delinquent taxpayer is uncertain; in any event, 26 U.S.C. §§ 6343 and 7426 provide that a third party whose property has been wrongfully levied might recover from the Government, *see Nat'l Bank of Commerce,* 472 U.S. at 748 n. 14, 105 S.Ct. at 2939 n. 14, a remedy the availability of which would likely preclude any liability on Rockland's part.

■ Rockland lastly contends that its liability is mitigated by the statute of limitations. As the United States notes in its reply memorandum, however, this argument cannot prevail. The April 6, 1988 levy embraced tax assessments the earliest of which was July 12, 1982. (There was a March 16, 1981 assessment, but this was paid in April, 1981 and not included in the levy. *See* Plaintiff's Reply Mem. at 1, n. 1). Section 6502 of the tax code at that time allowed six years between the time of assessment and the date on which notice of a levy is given. (The code was amended in 1990 to allow for a ten year period). Rockland points to nothing to support its assertion that the time interval is to be measured from the date of assessment to the date the Government filed the instant action in 1993.

Having thus found that Rockland was a third party in possession of property or property rights of a delinquent taxpayer levied upon by the Government, that it failed to comply with this levy, and that it has no adequate defense for such action, I conclude that it is liable to the plaintiff in the amount levied upon with interest.

### III.

#### *The Third–Party Defendant's Motion to Dismiss*

■ In assessing a motion to dismiss pursuant to Rule 12(b)(6), I must accept as true all material allegations in the complaint, drawing all reasonable inferences therefrom in the plaintiff's (here third-party plaintiff's) favor. *Watterson v. Page,* 987 F.2d 1, 3 (1st Cir.1993). I may then grant the motion only if it appears beyond doubt that the plaintiff can prove no set of facts that would entitle him to relief. *Lessler v. Little,* 857 F.2d 866, 867 (1st Cir.1988), *cert. denied,* 489 U.S. 1016, 109 S.Ct. 1130, 103 L.Ed.2d 192 (1989).

Belford posits three grounds upon which Rockland founders in pressing its claim for relief: (A) immunity, (B) statute of limitations and (C) absence of duty to, or lack of reasonable reliance by, Rockland.

#### –A–

■ Belford asserts that Rockland has premised its claim on the basis of statements made in the course of litigation which, being absolutely privileged, cannot give rise to civil liability. I am constrained to agree.

In *Sriberg v. Raymond,* 370 Mass. 105, 345 N.E.2d 882 (1976), the Supreme Judicial Court reviewed the question of privilege pertaining to statements made by attorneys in connection with litigation. The precise issue in that case was whether a defamatory statement made in a mailed communication threatening to bring suit enjoyed such privilege. In determining that it did, the court

---

**14.** In 1988, § 6332(d), now § 6332(e), was amended to exempt one also from liability to "any other person" as well as to the "delinquent taxpayer." This amendment applies only to levies issued after November 10, 1988, however. *See* 26 U.S.C.S. § 6332, History (1993).

noted that "[w]e have hitherto held that statements by a party, counsel or witness in the institution of, or during the course of, a judicial proceeding are absolutely privileged provided such statements relate to that proceeding." *Id.* at 108, 345 N.E.2d 882 (citations omitted). Extending the privilege then also to embrace communications made in anticipation of litigation, the court found that the basic elements of a commendable "public policy permitting attorneys complete freedom of expression and candor in their efforts to secure justice for their clients" had longstanding support in the Commonwealth:

> "It is, on the whole, for the public interest, and best calculated to subserve the purposes of justice, to allow counsel full freedom of speech, in conducting the causes, and advocating and sustaining the rights, of their constituents; and this freedom of discussion ought not to be impaired by numerous and refined distinctions."

*Id.* at 108–09, 345 N.E.2d 882 (quoting Chief Justice Shaw in *Hoar v. Wood,* 3 Metc. 193, 197–198 (1841)).

By and large, the cases asserting this proposition, like *Sriberg,* concern instances of libel or slander. *See, e.g., Aborn v. Lipson,* 357 Mass. 71, 256 N.E.2d 442 (1970) (defamatory matter published in response to question absolutely privileged), *Mezullo v. Maletz,* 331 Mass. 233, 118 N.E.2d 356 (1954) (witness' slanderous remarks absolutely privileged). The instant issue might thus be distinguished as involving nothing defamatory, but rather a simple falsehood (albeit blatant and direct). Yet the language used in *Sriberg* defining the scope of the privilege is not narrowly tailored to embrace only defamatory matter. This was evidently recognized in *Blanchette v. Cataldo,* 734 F.2d 869, 877 (1st Cir.1984), where the First Circuit reiterated the observations made in *Sriberg*—including the quotation from Justice Shaw—to conclude

"[t]hus, the Massachusetts courts have applied the privilege, not only in defamation cases, but as a general bar to civil liability based on [an] attorney's statements." Accordingly, the *Blanchette* court determined that an attorney could not be held liable for a phone call that "maliciously" and "unlawfully" interfered with the complainant's business so long as the communication was pertinent to his client's litigation. *Id.* *See also Sullivan v. Birmingham,* 11 Mass.App.Ct. 359, 367, 416 N.E.2d 528 (1981) (privileged nature of statements made in complaint—i.e., wrongful inclusion of ad damnum amount—provided defense not only to libel and intentional infliction of emotional distress, but "also immunizes the defendants from any civil liability based on the allegations" made therein); *Curtis v. Duffy,* 742 F.Supp. 34, 38 (D.Mass.1990) (citing *Blanchette* for proposition that "statements of attorneys made in connection with litigation are absolutely privileged under Massachusetts law").

Plainly, Belford's statement was pertinent to the interpleader action. That the statement may have been made maliciously or in bad faith, moreover, would not cause Belford's immunity to be withdrawn. *See Blanchette,* 734 F.2d at 77 (malicious and unlawful phone call privileged if pertinent to litigation); *Mezullo,* 331 Mass. at 236, 118 N.E.2d 356 (witness' remarks are absolutely privileged "even if uttered maliciously or in bad faith"). It follows, therefore, that the privilege attaches, providing Belford a complete defense to any civil liability flowing from the statement. Rockland has pointed to no other act of Belford's giving rise to liability; accordingly, the claim against him as framed here cannot go forward.[15]

Although I find the defense of privilege sufficient to grant Belford's motion, I will

---

15. One could argue that Belford's putative liability stems not only from the false statement made, but also from his alleged failure to have served the United States with process regarding his motion. *See* Third–Party Complaint at 11, ¶ 19; *compare* Belford's Mem. at 3 (asserting that the motion and memorandum was "served on all parties listed in Rockland's complaint in interpleader, including the United States"); *but see also* unsigned, undated copy of Certificate of Service appended to Third–Party Complaint. However, even setting aside the likelihood that such an omission would itself be immune from civil liability as to any party other than a client suing his attorney in malpractice, Rockland's own failure to have served the United States with proper notice of the initial filing of the interpleader action appears to have been a contributing cause for the success of Belford's unfounded motion.

briefly address the merits of the two other grounds upon which dismissal is sought.

–B–

As his second argument, Belford asserts that, inasmuch as the complained-of summary judgment motion was filed in December 1988, and Rockland did not file its present claims of negligence and fraud based thereon until April 1993, those claims are barred by the respective three-year statutes of limitations for such actions. *See* M.G.L. c. 260, § 2A (three-year limitation on bringing, *inter alia,* tort action); *Edwards v. John Hancock Mut. Life Ins. Co.,* 973 F.2d 1027, 1029 (1st Cir.1992) (noting same re: negligence claims); *Maggio v. Gerard Freezer & Ice Co., et al.,* 824 F.2d 123 (1st Cir.1987) (noting same in fraud claim context).

The statute of limitations for a claim in tort generally begins to run at such time as the complainant is put on notice that it has been injured. *Edwards,* 973 F.2d at 1029. Thus, the so-called "discovery rule" can toll the running of the statute in cases where it is adjudged that the cause of action was "inherently unknowable" until sometime after the negligent or deceitful act occurred. *Id.* In the instant case, Rockland argues that, while Belford's negligent or deceitful act occurred in December 1988, it had no way of knowing it would be injured thereby until February 1993, when the United States first gave notice that it would be filing the instant claim seeking the monies owed by Gifford. *See* Rockland's Opp. at 8. I agree.

In *Massachusetts Elec. Co. v. Fletcher, Tilton & Whipple, P.C.,* 394 Mass. 265, 475 N.E.2d 390 (1985), the plaintiff claimed that the defendants' negligent handling of a prior lawsuit had obliged it to make a larger settlement payment than would otherwise have been necessary, which in turn gave rise to an action by the plaintiff's insurance company seeking a return of the excess settlement funds. The Supreme Judicial Court found that while "the [plaintiff] knew immediately of the alleged negligence of the defendant

attorneys, [ ] it was not clear then that the alleged negligence had caused or would cause the companies any appreciable harm." *Id.* at 267–68, 475 N.E.2d 390. Thus applying the rule of discovery, the court held that the plaintiff's cause of action had accrued not at the time of the negligent act, but rather sometime thereafter "when some harm ha[d] occurred", i.e., "at least by the time the [insurance] action was commenced." *Id.* at 268, 475 N.E.2d 390.[16]

In the instant case, Rockland laid no claim to the surplus funds it had interpleaded. Thus, it could not have been directly harmed by the court's disposition of those funds in reliance upon the misrepresentation in Gifford and Belford's summary judgment motion. Belford asserts that because Rockland knew of the United States' lien, it would have known "that the United States would pursue its claim." Reply Mem. in Support of Belford's Mot. to Dismiss ("Belford's Reply") at 3. While this may be so, a) to the extent Rockland was then aware of it, Belford and Gifford's very misrepresentation of the lienholders' status may have led Rockland into assuming that the United States' claim had been satisfied, and b) in any event, Belford fails to explain why Rockland should not have presumed that the United States would pursue Gifford first (and perhaps last) for the money. I find, therefore, that any harm Rockland may have suffered from the misrepresentation occurred for discovery rule purposes not at the time it was made, but rather when the United States began to pursue Rockland directly for Gifford's unpaid taxes, i.e., in February 1993. Accordingly, Rockland's present third-party complaint is not time-barred.

–C–

Belford's final argument is that Rockland has failed to show the elements necessary to its claims, that is, the element of duty necessary to its claim of negligence, and the elements of intended inducement or reliance necessary to its fraud claim. I agree.

---

**16.** Recognizing that accrual of a cause of action does not wait upon knowledge of the "full extent and nature of the harm", but rather only until "some harm has occurred", the court held that the cause of action had accrued prior to the plaintiff's settlement with the insurance company. *Massachusetts Elec. Co.,* 394 Mass. at 268, 475 N.E.2d 390.

### 1. *Negligence Claim*

In order to support a claim of negligence, a claimant must allege a breach of some duty owed it by the defendant. Seeking to establish this, Rockland adverts to caselaw under which an attorney might be found liable to a non-client if it is shown that " 'the defendant knew that the plaintiff would rely on his services.' " *Page v. Frazier*, 388 Mass. 55, 64, 445 N.E.2d 148 (1983) (citations omitted). *See also Craig v. Everett M. Brooks Co.*, 351 Mass. 497, 222 N.E.2d 752 (1967) (lack of contractual relation no bar to recovery given "foreseeable reliance"). Thus, in *Craig*, the Supreme Judicial Court permitted recovery by a general contractor for negligent performance by a civil engineer where, although no contract lay between the two, both had separate contracts with the developer and "the identity of the only possible plaintiff and the extent of his reliance were known to the defendant, and [ ] damages [were] not remote." *Craig*, 351 Mass. at 501, 222 N.E.2d 752.

I do not find the circumstances of the instant case analogous to *Craig*. Even if Belford were said to have foreseen some "reliance" on his statement, no doubt it would have been by the Superior Court, not Rockland. Indeed, given that Gifford was no longer in debt to Rockland at that time and, concomitantly, Rockland had no direct interest in the surplus funds, it is unclear how Belford might have foreseen either Rockland's "reliance" on the statement or the scope of any consequent damages. *See* Rockland's Opp. at 3 (having filed the interpleader, Rockland "was essentially out of the

litigation as it had no further interest in the proceeds or disbursement thereof").

More importantly, however, even if one supposes that Belford should have foreseen Rockland's reliance, his proper concern in such circumstance would nevertheless have been for his client, not for Rockland. Thus, in *Page*, the Supreme Judicial Court as a general matter declined to allow recovery by a non-client for the negligent conduct of an attorney where that attorney "is also under an independent and potentially conflicting duty to a client." *Id.* at 63, 445 N.E.2d 148. *See also Robertson v. Gaston Snow & Ely Bartlett*, 404 Mass. 515, 524, 536 N.E.2d 344 (1989) (quoting *Page* to effect that "we are less likely to impose a duty to non-clients" where attorney has independent and possibly conflicting duty to client).[17] Rockland has presented no facts or argument suggesting why Belford in any way should have subordinated the interests of his client to those of Rockland.[18] Absent such a showing or other indication of breach of duty, Rockland's claim of negligence cannot go forward.

### 2. *Fraud Claim*

As set out in *Graphic Arts Finishers, Inc. v. Boston Redev. Auth.*, 357 Mass. 40, 44, 255 N.E.2d 793 (1970), "[t]he elements necessary to maintain an action in deceit [provide that] 'One who fraudulently makes a misrepresentation of fact, opinion, intention or law for the purpose of inducing another to act or refrain from action in reliance thereon in a business transaction is liable to the other for the harm caused to him by his justifiable reliance upon the misrepresentation.' " *Id.*

---

**17.** The court in *Craig* found telling that the defendant knew what the "precise purpose" of his performance was to be in the context of the plaintiff's expectations—and so determined that he should be held liable for negligent deviation therefrom. 351 Mass. at 500. From this one might argue that, since Belford knew that Rockland's expectation in filing the interpleader suit was to facilitate proper disbursement of the surplus funds, he should be held liable for having foiled that expectation with his summary judgment motion. The rebuttal, however, is that Belford was working for Gifford, not Rockland, and thus the "precise purpose" of the motion as submitted was not to achieve Rockland's ends, but Gifford's. *See Beecy v. Pucciarelli*, 387 Mass. 589, 597, 441 N.E.2d 1035 (1982) (observing that nature of adversary system precludes adverse

party's reliance on opposing party's attorney). Thus, to the extent that Rockland was relying on anything beyond the adversary system—which it had already weakened by not serving timely notice of filing—such reliance was not reasonable.

**18.** Rockland cites *Frontier Enterprises, Inc. v. Anchor Co. of Marblehead, Inc.*, 404 Mass. 506, 511–12, 536 N.E.2d 352 (1989), for the proposition that an attorney may be held liable for funds paid to a third party which were "earmarked" and "belong[ed]" to another party. Any analogy here, however, would be inapt. In the instant case, Belford did not "pay" funds to anyone. Indeed, if *Frontier Enterprises* suggests potential liability in this case for such conduct, it would appear to be that of Rockland.

(quoting Restatement Torts, § 525). In the instant case, Rockland states that Belford knew his statement to be false and that he made it "to induce the [Superior] Court to act upon his Motion favorably." Rockland's Opp. at 10. Rockland fails to allege, however, how the statement was intended to induce *Rockland* to rely on it. Indeed, Rockland as an adverse party, albeit in the relatively neutral role of a stakeholder, can hardly be said reasonably to have relied upon Belford's assertions. Further, even assuming the statement was somehow meant to be relied upon by Rockland, Rockland fails to indicate how or when it *relied* on the misrepresentation, given that no action was incumbent upon it at that time and it apparently took no action in reliance upon the statement any time thereafter. Rockland thus having failed adequately to allege at least two elements necessary to support its claim of fraud, I find that this Count cannot stand.

## CONCLUSION

For the reasons set forth above, the plaintiff's motion for summary judgment is GRANTED; the third-party defendant Belford's motion to dismiss is also ALLOWED as to all Counts.